UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ANDREW PEZZA,

    Plaintiff,

    v.

MIDDLETOWN TOWNSHIP PUBLIC
SCHOOLS, MIDDLETOWN TOWNSHIP
BOARD OF EDUCATION, JAMES
ALTOBELLO, WILLIAM GEORGE III,
KIMBERLY PICKUS, AMY
GALLAGHER, ROSIE SHOPP, SUSAN
GARAFALO, JOANNE MAGISTRO,
JOHN DOES 1-10 AND JOHN DOE
CORPORATIONS 1-10,

    Defendants.

Civil Action No. 18-16354 (RK) (DEA)

**OPINION**

**KIRSCH, District Judge**

    **THIS MATTER** comes before the Court on Defendants Middletown Township Public

Schools ("MTPS"), Middletown Township Board of Education ("MTBOE"), James Altobello

("Altobello"), William George III ("George"), Kimberly Pickus ("Pickus"), Amy Gallagher

("Gallagher"), Rosie Shopp ("Shopp"), Susan Garafalo ("Garafalo"), and Joanne Magistro's

("Magistro") (collectively, "Defendants") Motion for Summary Judgment, ("DMSJ," ECF No.

81), and Plaintiff Andrew Pezza's ("Plaintiff" or "Pezza") Cross-motion for Summary Judgment.

("PMSJ," ECF No. 86.)

    The Court has considered the parties' submissions and resolves the matter without oral

argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons

set forth below, Defendants' Motion for Summary Judgment, (ECF No. 81), is **GRANTED**; Plaintiff's Motion for Summary Judgment, (ECF No. 86), is **DENIED**.

## I.    <u>BACKGROUND</u>

### A.    PROCEDURAL HISTORY AND SUMMARY

On November 5, 2018, Plaintiff filed the subject lawsuit in the Superior Court of New Jersey, Law Division, Monmouth County. (*See* ECF No. 1-2.) Plaintiff asserts ten causes of action: disability discrimination in violation of the New Jersey Law Against Discrimination ("NJLAD") (Count I);[1] disability discrimination in violation of the Americans with Disabilities Act ("ADA") (Count II); retaliation in violation of the NJLAD (Count III); aiding and abetting discrimination and/or retaliation in violation of the NJLAD (Count IV); interference with entitlements in violation of the Family and Medical Leave Act, 29 U.S.C. § 2615 ("FMLA") (Counts V and VI); retaliation in violation of the FMLA against Defendants MTPS and MTBOE (Counts VII and VIII); violation of the New Jersey Civil Rights Act ("NJCRA") (Count IX); and violation of the statutory and common laws of the State of New Jersey (Count X). (*See id.*)

Defendants removed this case to federal court on November 21, 2018. (*See* ECF No. 1.) Following the close of discovery, the parties filed respective Motions for Summary Judgment, which are now pending before this Court. (ECF Nos. 81, 86.) Plaintiff opposed Defendants' motion, ("Pl. Opp.," ECF No. 89), and Defendants replied. ("Def. Reply.," ECF No. 90.) Defendants opposed Plaintiff's motion, ("Def. Opp.," ECF No. 88), to which Plaintiff replied. ("Pl. Reply.," ECF No. 91.)

The parties also submitted statements of facts. Defendants filed a Statement of Facts, ("Def. SOF 1," ECF No. 81-4), accompanying their opening brief. In opposing Defendants' motion,

---

[1] Unless otherwise noted, the claims are asserted against all defendants.

Plaintiff filed a Counter Statement of Facts. ("Pl. SOF 1", ECF No. 89-1.)[2] Plaintiff also filed a Statement of Facts with his opening brief, ("Pl. SOF 2," ECF No. 86-1), to which Defendants responded with their Counter Statement of Facts. ("Def. SOF 2," ECF No. 88-1.)

## 1. SUMMARY

A summary of this lawsuit, which will be set forth in greater detail herein, is as follows: Plaintiff, then twenty-four (24) years-old, served as a paraprofessional at a public elementary school in Middletown Township in New Jersey. His employment began in late April 2016 and continued through the following school year, which included extensive absences and multiple requests for leave, each which were granted. Plaintiff's employment was not renewed for the following year, the 2017–2018 school year.

Plaintiff asserts ten (10) causes of action, claiming disability and retaliation under the ADA and NJLAD, among other things, naming as defendants, Middletown Township Public Schools and its Board of Education, and seven (7) individual school administrators and teachers. Prior to and throughout his tenure as a paraprofessional, Plaintiff failed to affirmatively apprise any school personnel of a purported disability, and failed to seek any accommodation for same.[3]

Defendants claim that Plaintiff failed to satisfactorily perform the functions of a paraprofessional, and that he was reassigned mid-year to a different classroom in a different grade

---

[2] Plaintiff's Counter Statement of Facts contains duplicative paragraph numbers, failing to adhere to the "separately numbered paragraphs" requirement of Local Civil Rule 56.1. Plaintiff responds to Defendants' Statement by numbered paragraphs, but then restarts the numbering in its own Counter Statement of Facts at paragraph one (1). As such, a citation to ECF No. 89-1, ¶ 2 would be unclear, as the Court could be citing to Plaintiff's response on page two (2) or page fifty-six (56). Therefore, the Court refers to page numbers in Plaintiff's Counter Statement of Facts, (ECF No. 89-1), by ECF header and denotes such references with an asterisk.

[3] In the last of five notes from various medical personnel, after Plaintiff had already begun his medical leave and had received a letter from Defendants stating that his employment would not be renewed for the following year, Plaintiff specified the symptoms he was facing.

in the hope of improved performance which proved unsuccessful.[4] While it appears that the school required reduced paraprofessional support the following year, Defendants state that Plaintiff's employment was not renewed due to his poor performance, as articulated by multiple teachers with whom he worked directly, and the school principal. Plaintiff argues that the Defendant's basis for failing to renew his employment is a pretext for discrimination and retaliation.

### B.   FACTS

This action stems from the termination of Plaintiff from his employment with Middletown Township Public Schools. The undisputed factual circumstances surrounding this action are set forth in the parties' respective statements and counter-statements of facts in accordance with Local Civil Rule 56.1. (*See* "Def. SOF 1," ECF No. 81-4; "Pl. SOF 1", ECF No. 89-1; "Pl. SOF 2," ECF No. 86-1; "Def. SOF 2," ECF No. 88-1.)[5] Any disagreements among the parties as to a fact or characterization are noted herein.

---

[4] In January of 2017, Principal Altobello prepared a midyear written evaluation of Plaintiff which chronicled his unsatisfactory performance in a number of areas. Instead of finalizing and issuing the evaluation at the time, Altobello held same in abeyance, opting instead to reassign Plaintiff, giving him an opportunity to improve.

[5] The Court notes that Plaintiff denies many of the statements in Defendants' Statement of Material Facts, (ECF No. 81-4), but a significant number of the denials include opinions and distortions of the record that fail to rebut the fact as set forth by Defendant. "A Rule 56.1 statement 'that contains a combination of fact, opinion and legal conclusions presents a significant burden on the Court to determine what facts are disputed by the parties.'" *Shann v. Atl. Health Sys.*, No. 12-4822, 2017 WL 5260780, at *1 (D.N.J. Nov. 13, 2017) (quoting *Ivan v. Cty. of Middlesex*, 595 F. Supp. 2d 425, 440 n.1 (D.N.J. 2009)). While the Court must "accept the allegations of the non-moving party as fact and reasonable inferences therefrom in defiance of the motion," *Ivan*, 595 F. Supp 2.d at 440 n.1, the Court must endeavor to separate facts from mere opinions. Moreover, "a plaintiff cannot use conclusory denials of his or her own inappropriate conduct to create a genuine issue of material fact," *Bals v. Trump Nat'l Golf Club Colts Neck LLC*, No. 14-6055, 2016 WL 7325475, at *11 (D.N.J. Dec. 16, 2016), and, as the Court will discuss, the evidence Plaintiff sets forth to support its denial of many of Defendants' facts fails to show how the fact is inaccurate or controverts Defendants' facts.

### 1. 2015–2016 School Year

Plaintiff was hired by Middletown Township Public Schools and began working as a paraprofessional at Navesink Elementary School ("Navesink") on April 27, 2016. (Pl. SOF 2 ¶ 3.) Plaintiff was twenty-four (24) years old at the time he was hired. (See ECF No. 86-7; Ex. JJ.) The week prior to starting at Navesink, Plaintiff met with a physician, who provided a "Certificate of Health" to MTPS. (ECF No. 86-6, Ex. D.) The doctor cleared Plaintiff for work, stating: "I hereby certify that I have examined the person named above and found him/her to be in good health and free from physical or mental conditions that would interfere with his/her work as a public school employee." (*Id.*)

The parties disagree as to the requirements of Plaintiff's role, but, at its essence, paraprofessionals are assigned to classrooms where they assist teachers with their day-to-day responsibilities. (*See* Def. SOF 1 ¶ 16, Pl. SOF 1 at *58.) As Plaintiff explained in his deposition, his job duties included, *inter alia*, "assist[ing] with . . . the morning routine," "help[ing] the teacher with classroom operations," and "instruct[ing] the kids." ("Pezza Dep. Tr.", ECF No. 81-7, Ex. B at 30:6–31:5.) When Plaintiff first began at Navesink, he was assigned to Miss Frazze's first grade classroom, which included both general and special education students. (*Id.* at 31:12–32:2.)

On April 27, 2016, the same day he started, Plaintiff received a letter from MTPS Superintendent William George III, notifying him that his employment "was not being renewed for the 2016-2017 school year." (Pl. SOF 2 ¶¶ 6–7; Def. SOF 1 ¶11.) These non-renewal letters were customary, and "[a]ll paraprofessionals" received such a letter each year.  (Pl. SOF 2 ¶ 8.)

On May 24, 2016, following the end of the 2015–2016 school year, and based on less than one month of Plaintiff's work at the school, Altobello, the principal of Navesink, submitted an evaluation of Plaintiff. (Pl. SOF 2 ¶ 10; Def. SOF 1 ¶ 13; *see also* "Pezza Eval. 1," ECF No. 81-7,

Ex. H.) Altobello wrote, "Mr. Pezza has done a[] wonderful job acclimating to his new position. He has transitioned seamlessly into the room where he works and comes each day prepared to help the students and the staff move forward in a positive direction." (Pezza Eval. 1 at 1.) In addition, Plaintiff received "Satisfactory" grades for sixteen (16) of the seventeen (17) criteria in the evaluation. (*Id.*) He received one "Not Applicable." (*Id.*) Altobello also recommended Plaintiff for reemployment. (*Id.*)

### 2.   2016–2017 School Year

On June 9, 2016, Altobello recommended that Plaintiff "be placed on the re-hire list," and on June 22, 2016, Plaintiff was notified that the MTBOE had "approved [his] employment as a Paraprofessional for the 2016–2017 school year." (ECF No. 81-7, Ex. I; Def. SOF 1 ¶ 14.) Thereafter, Plaintiff was assigned again to Navesink as a paraprofessional. (Def. SOF 1 ¶ 15; Pl. SOF 1 at *7.)

For the first ten days of the new school year, Plaintiff was assigned to Ms. Terell's first grade classroom. (Def. SOF 1 ¶ 16; Pl. SOF 1 at *7.) Following his short stint there, he moved to become the "classroom para" in Racioppi's "K-2" classroom. (Def. SOF 1 ¶ 16; Pl. SOF 1 at *8.) Racioppi's classroom was "a behavioral classroom" in which all of the students required "special attention." (Pezza Dep. Tr. 36:19–24.) The students in Racioppi's class ranged from ages five to eight. (Def. SOF 1 ¶ 16.) As the classroom paraprofessional, Plaintiff worked with students as a one-to-one aide on an "as-needed basis," although he was not the assigned one-to-one aide for the classroom. (Pezza Dep. Tr. at 38:2–39:2.)[6]

---

[6] Classrooms may also be assigned "one-to-one aides," along with classroom paraprofessionals. (Pezza Dep. Tr. 38:22–39:5.) The "one-to-one aides" work directly with a certain student to provide extra assistance throughout the day. (*Id.* at 37:13–20.)

Plaintiff served as the classroom paraprofessional in Racioppi's classroom from September 2016 until January 2017. (Def. SOF 1 ¶ 17.) Throughout Plaintiff's tenure as her aid, Racioppi approached Altobello and discussed with him in person "three major issues." ("Racioppi Dep. Tr.," ECF No. 81-7, Ex. PP at 19:11–20:9.) First, during a fire drill, Plaintiff "panicked," was "very nervous," and started "flapping." (*Id.* at 22:8–24:1.) While Plaintiff was not sure whether it was a fire drill or real emergency, Racioppi advised Plaintiff to "remain calm," and after school that day, the two discussed the importance of Plaintiff's demeanor during fire drills, as "it was scary for the students to see [Plaintiff] get upset." (*Id.*) Second, when a student "went into crisis" and needed to be restrained, Plaintiff was required to assist in a "two-man hold" to confine the student; however, Plaintiff "let go [of the student] and started flapping." (*Id.* at 40:3–25.) This resulted in the student "throw[ing] a punch" at Racioppi. (*Id.*) After school, Plaintiff and Racioppi discussed the incident, and Plaintiff told her he was "not comfortable doing holds." (*Id.*) Third, a student was sitting next to Plaintiff, when that student reached and grabbed Plaintiff's hair. (*Id.* at 41:13–42:13.) Plaintiff became "very upset and . . . shouted." (*Id.*) Following this incident, Racioppi again stressed to Plaintiff the importance of remaining calm around the students. (*Id.*) Racioppi stated that Plaintiff "did not meet [her] expectations in the role as a paraprofessional in [her] classroom." (ECF No. 81-7, Ex. K.)[7]

### 3. Plaintiff's Transfer

On January 18, 2017, Altobello emailed Mary Ellen Walker, the assistant superintendent of MTPS, proposing to switch the classroom assignments of Plaintiff and another paraprofessional, Matt Murphy. (ECF No. 81-7, Ex. L at -421.)[8] Altobello recommended moving Plaintiff from

---

[7] As will be addressed below, Plaintiff disputes the occurrence of these events.

[8] The Court will refer to a pincite in an exhibit by the last three pages of the Bates Number.

Racioppi's "K-2 Behaviorally Disturbed Program" to a "B Level Grade 5 ICS [In Class Support]" role. (*Id.*) Altobello stated that Plaintiff "does not have the presence necessary to manage the students in the BD [Behaviorally Disturbed] program," and that even "with training provided by the School Psychologist, the Principal and the classroom teacher he still is having difficulty establishing the presence necessary to be effective in the BD program. We are confident that his demeanor and attentiveness would be fine in the ICS setting where presence is not as important." (*Id.*) Finally, Altobello attached "a recently conducted observation of Plaintiff to support the necessity of the switch." (*Id.*) However, Altobello noted he was "willing to forgo submitting this observation and re-observe Plaintiff if his setting is switched to give him an opportunity to show growth as a paraprofessional." (*Id.*) The draft observation scored Plaintiff with five (5) "Unsatisfactory," five (5) "Needs Improvement," and five (5) "Satisfactory" scores. (*Id.* at -422.) For example, Plaintiff received an "Unsatisfactory" score in "Participates in the supervision of students" and "Implements strategies / programs as per teachers [sic] requests." (*Id.*)

On January 24, 2017, Plaintiff was transferred to Moyer's fifth-grade classroom. (Pl. SOF 2 ¶¶ 28–30.) This transfer resulted in a pay cut from $621 to $542 per week. (*Id.* ¶ 29.) As part of this switch, Plaintiff became a "one-to-one" aide. (*Id.* at 40:6–11.) In this role, Plaintiff worked predominately with one student across different teachers. (*Id.* at 39:22–40:11.) This led Plaintiff to work with both Moyer and Newcomb. (*Id.*; "Moyer Dep. Tr.," ECF No. 81-7, Ex. CC at 67:16–19.) Newcomb taught "reading and social studies," which resulted in her working with Plaintiff daily for reading and between two or three times per week for social studies. ("Newcomb Dep. Tr.," ECF No. 81-7, Ex. DD at 16:6–13.)

In connection with Plaintiff's new role, Altobello emailed Dr. April Kaby ("Kaby"), Moyer, and Newcomb, recommending that additional training be provided to Plaintiff. (ECF No.

86-6, Ex. V.) Moyer responded directly to Altobello without copying Kaby or Newcomb, stating

"Thx!" to which Altobello responded directly to Moyer with "hope for a crime." (ECF No. 86-6,

Ex. Y.) Moyer responded, "lol" with a smiley face emoji. (*Id.*)

      While Plaintiff disagrees, Defendants explain that Plaintiff's performance issues continued

on this new rotation. (Def. SOF 1 ¶ 39.) For example, Moyer testified that Plaintiff was "on his

phone" in order "to Google how to solve the math problems that he was trying to help his student

that he was responsible for." (Moyer Dep. Tr. 67:23–70:16.) Moyer further testified that Plaintiff

"[a]cademically . . . could not perform in the fifth grade classroom, [so] he couldn't do the job that

he needed to do," resulting in Plaintiff "helping [the students] to solve the problems incorrectly"

and Moyer "go[ing] back and redo[ing] the job". (*Id.* at 95:11–96:8.) In addition, Plaintiff did not

learn the names of the students in Moyer's class, which resulted in, approximately "a dozen" times,

Plaintiff being unable to find the correct student to assist. (*Id.* at 101:8–21.) While she did not write

these issues down, she verbally informed Altobello. (*Id.* at 104:16–22.) Moyer noted that "for the

short time that [Plaintiff] was in my classroom as a paraprofessional, he required a lot of assistance

from the teachers working with him. He never was 'hands on' without prompting, and when

working with students, needed support with what he was reviewing." (ECF No. 81-7,

Ex. N.)

      In addition, Plaintiff struggled to perform in Newcomb's class. (Newcomb. Dep. Tr. at 44:

8–10.) Specifically, Newcomb testified that Plaintiff had "difficulty applying" the constructive

feedback she gave to him. (*Id.*) Moreover, Newcomb found that Plaintiff, "even after the typical

learning period had passed . . .[,] Mr. Pezza still waited to be instructed or cued as to how to handle

situations and rarely if ever took initiative to address a behavioral issue if one arose." (ECF No.

81-7, Ex. O.) In addition, in his work as a one-to-one aide, she stated Plaintiff "struggled with how

best to motivate the child despite the suggestions that were made to him, and was usually incapable of de-escalating the child when an outburst was imminent." (*Id.*) Further, Newcomb referenced Plaintiff's "frequent absences." Plaintiff's attendance issues were known to Altobello as well. Prior to his medical leave of absence, Plaintiff had "exhausted all of his sick days and had used a number of unpaid days as well." (ECF No. 81-7, Ex. T.) Further, Altobello testified that Plaintiff failed to follow the proper procedures for reporting his absences, and "there were times that he didn't let anybody know" that he would be absent. ("Altobello Dep. Tr.," ECF No. 81-7, Ex. C at 335:6–12.)

### 4.  Plaintiff's FMLA Leave

Prior to and unrelated to his employment with MTPS, Plaintiff "was the victim of an aggravated assault . . . [on] January 1, 2015." (Pl. SOF 2 ¶ 1.) This assault caused Plaintiff to suffer a "serious head injury" which required surgery. (*Id.* ¶¶ 2, 17.) The procedure left a "scar running just behind [Plaintiff's] ears and across the top of his head." (*Id.* ¶ 17.)

The Monmouth County Prosecutor's Office initiated a criminal action against the perpetrator. (*Id.* ¶ 15.) Plaintiff was asked to cooperate in the investigation. (*Id.*) To assist, Plaintiff met with the prosecution and testified in court, which required him to miss school days, including in September and October of 2016, and February of 2017. (*Id.* ¶ 16; ECF No. 86-7, Ex. AA.) Plaintiff apprised Altobello of these absences. (ECF No. 86-7, Ex. BB.) As Plaintiff continued to work with the prosecution, he continued to miss days into March of 2017. (ECF No. 86-7, Ex. FF.) Altobello explained Plaintiff's absences to Pickus, the Assistant Superintendent for MTPS, noting that Plaintiff was a "key witness" in the investigation. (*Id.*) Dr. Magistro noted to Plaintiff that this experience "must be very stressful for [him]." (ECF No. 86-7, Ex. GG.)

10

On April 4, 2017, Plaintiff provided Defendants with a "note from Alison Lewis, M.D., stating that he was under Dr. Lewis' care and being held out of work until April 10, 201[7]." (Pl. SOF 2 ¶ 44.) Shortly thereafter, on April 24, 2017, Plaintiff provided another doctor's note, this time from Stress Care of New Jersey, LLC, exempting Plaintiff from work from April 19 to April 24, 2017. (*Id.* ¶ 45.) Plaintiff himself also requested a medical leave of absence "due to [his] own serious medical condition" from April 25 to May 8, 2017. (ECF No. 86-7, Ex. KK.) On April 28, 2017, Plaintiff provided another doctor's note from Stress Care of New Jersey, LLC, which stated that Plaintiff "is not capable of performing his job duties at this time. It would be advised that he take a leave of absence from work, for his safety." (ECF No. 86-7, Ex. LL.)

Thereafter, on May 8, 2017, Plaintiff provided an additional doctor's note, which extended his medical leave until June 5, 2017. (ECF No. 86-7, Ex. QQ.) This request was approved by MTBOE on May 24, 2017. (Pl. SOF 1 at *32–*33.) On June 5, 2017, another doctor's note was submitted on Plaintiff's behalf, which stated that Plaintiff "is not mentally stable to work at this time." (*Id.*) This note, unlike the others, for the first time explained that Plaintiff "is being treated at our office and is still complaining of high anxiety, depression, and severe PTSD." (ECF No. 86-7, Ex. WW.) All told, Plaintiff submitted some five notes from medical personnel seeking medical leave, citing, for example, that he was under a doctor's care, that he was not capable of doing his job, that his safety was at risk, and that he was mentally unstable to work.[9] (See Pl. SOF 2

---

[9] The five notes from medical personnel that Plaintiff submitted are as follows:

- An April 4, 2017 letter: "Andrew Pezza is currently under my medical care and may not return to work at this time. Please excuse Andrew for 3 day(s). He may return to work on 4/10/2016. Activity as restricted: none. If you require additional information please contract our office." (ECF No. 86-7, Ex. II.)

- An April 24, 2017 letter: "This letter is to confirm that Mr. Pezza has been seen at Stress Care of New Jersey today and was exempt from work on Wednesday 4/19, Thursday 4/20, and Friday 4/21 pending this appointment." (ECF No. 86-7, Ex. JJ.)

¶¶ 44–61.) Plaintiff remained on medical leave through the end of the 2016–2017 school year and did not return to work. (*See* Pl. SOF 1 at *32; ECF No. 81-7, Ex. Q.)

### 5.  Plaintiff's Discharge

On April 28, 2017, Plaintiff received a non-renewal letter from Superintendent George, letting him know that his employment would not be renewed for the 2017–2018 school year. (ECF No. 81-7, Ex. R.)[10] A few weeks later, on May 18, 2017, Altobello emailed Robert Dunn, the

---

- An April 28, 2017 letter: "Mr. Pezza was seen in this office for a psychiatric evaluation on 4/24/17. After careful determination of the patients [sic] treatment plan, he is not capable of performing his job duties at this time. It would be advised that he take a leave of absence from work, for his safety. If there are any questions or concerns, with a valid release of information on file please call the number above." (ECF No. 86-7, Ex. LL.)

- A May 8, 2017 letter: "Andrew Pezza is under my care and will be extending his leave from work until his next appointment on 6/5/2017. He will be e-evaluated then." (ECF No. 86-7, Ex. QQ.)

- A June 5, 2017 letter: "Patient is being treated at our office and is still complaining of high anxiety, depression, and severe symptoms of PTSD. For his safety, the patient is not mentally stable to return to work at this time. Feel free to contact us at any time." (ECF No. 86-7, Ex. WW.)

[10] In his deposition, Merlino explained that when a nontenured employee is non-renewed, that is equivalent to termination. ("Merlino Dep. Tr.," ECF No. 81-7, Ex. AA at 41:4–16; 61:17–23.) This is further evidenced by the MTBOE Policies. (*See* ECF No. 81-7, Ex. EE.) Policy 4146 states:

> A nontenured support staff member who is not recommended for renewal by the Superintendent is deemed nonrenewed. When the nontenured support staff member's performance does not meet the standards of the district, the Superintendent shall recommend not to renew the support staff member's contract. Prior to notifying the nontenured support staff member of the nonrenewal, the Superintendent will notify the Board of the recommendation not to renew the support staff member's contract and the reasons for the recommendation. The Superintendent may notify the Board in a written notice or in executive session at a full Board meeting. In the event the Board is notified in executive session, the Superintendent will comply with the requirements of the Open Public Meetings Act and provide reasonable notice to the nontenured support staff member their employment will be discussed in executive session in order for the support staff member to exercise their statutory right to request a public discussion.

*Id.* Whether Plaintiff was nonrenewed or discharged is inconsequential. Plaintiff's employment was at-will, which allowed Defendants to not renew or terminate his employment absent a violation of law. *See Powell v. Advancing Opportunities*, No. 22-525, 2022 WL 16961387, at *3 (D.N.J. Nov. 16, 2022).

District Director of Student Services for MTPS. (Pl. SOF 2 at ¶ 54.) In his email, Altobello stated that he was "going to lose 1 para (Andrew Pezza) who has only been here 1 year so it is neat and clean." (*Id.*) About two weeks later, on May 30, 2017, Altobello emailed Shopp, in which he noted Plaintiff was on leave and stated that he "ha[d] to do his evaluation in which I will be destroying him and recommending him not to be rehired." (ECF No. 86-7, Ex. TT.) Altobello emailed Shopp his draft evaluation for Plaintiff on June 2, 2017, requesting her review and sign off. (Pl. SOF 2 ¶ 59.) Three days later, Shopp responded to Altobello, letting him know that she reviewed the evaluation with Pickus. (*Id.* ¶ 62.) Shopp recommended Altobello add that, "As a result Mr. Pezza will not be recommended for rehire in the district for the 2017–2018 school year." (*Id.*) On June 8, 2017, Pickus forwarded an email to Altobello, in which Pickus mentioned that a teacher had applied to a paraprofessional position within MTPS. (ECF No. 86-7, Ex. ZZ.) Pickus explained her decision to forward the email as she knew he was "getting rid of [Plaintiff] . . ." (*Id.*) On June 12, 2017, Altobello emailed Pickus, recounting Plaintiff's performance struggles, including those with Racioppi, his transition from BD to fifth grade, and his numerous absences. (ECF No. 81-7, Ex. T.) Altobello also mentioned that the "paraprofessional necessity at Navesink will be reduced from its current level" in the next school year, and "[b]ased on the above mentioned factors the determination was made to recommend that [Plaintiff] not be rehired." (*Id.*)

On June 14, 2017, Altobello submitted his final evaluation for Plaintiff. (ECF No. 86-8, Ex. AAA.) Altobello gave Plaintiff five (5) "Satisfactory" scores, six (6) grades of "Needs Improvement," five (5) "Unsatisfactory" scores, and one (1) "Not Applicable." (*Id.*) Altobello summarized Plaintiff's performance as follows:

> Mr. Pezza has been working in our BD program for the better part of three months at the beginning of the school year. . . . Mr. Pezza was incapable of making a successful adjustment from both an academic as well as a behavioral/supervisory role. He has not

> responded well to suggestion, nor does he follow directions given by the teacher fully resulting in the potential for unsafe environments . . . his placement was changed mid year to a 5th grade personal paraprofessional for one student. . . . Again Mr. Pezza had difficulties with meeting the task demands of this assignment. As a result, Mr. Pezza will not be recommended for rehire in the district for the 2017–2018 school year.

*Id.* The next day, Plaintiff emailed Altobello, Pickus, and George, letting them know that he was "filing suit against Middletown Board of Education" and requesting to whom Plaintiff should provide notice of his tort claim. (ECF No. 81-7, EX. FF.) On June 22, 2017, Pickus provided Plaintiff this information. (Pl. SOF 2 ¶ 67.) Following receipt of Plaintiff's intent to sue, Altobello asked Racioppi, Moyer, and Newcomb to prepare written statements regarding Plaintiff's tenure in their classrooms. (*See* Def. SOF 1 ¶ 68; *see also* ECF No. 81-7, Exs. K, N, and O.) On June 23, 2017, Defendants provided Plaintiff with a "Rice Notice." (Pl. SOF 2 ¶ 68.)[11]

Plaintiff objected to Defendants' evaluation of his performance in a June 24, 2017 email to Defendant George, the Superintendent of MTPS. (*Id.* ¶ 69.) Of note, Plaintiff stated he was "on a medical leave of absence," and "[t]he review that was done twice by Mr. Altobello this year is inaccurate" and "does not reflect my true work ethic." (*Id.* ¶ 70.) Plaintiff did not receive a response from George, as MTBOE legal counsel Jeffrey Merlino advised Defendants not to communicate with Plaintiff. (*Id.* ¶ 71.)

Plaintiff and Defendants continued to exchange email correspondence throughout June and July. Plaintiff requested that "discussion of his employment be held in public," to which Defendants agreed. (*Id.* ¶ 72.) Plaintiff requested an investigation into what he alleged to be discrimination by Defendants. (*Id.* ¶ 73.) On June 27, 2017, the Board voted in favor of Plaintiff's

---

[11] A "Rice Notice" is the "reasonable notice" an employer must give to an employee when the "entity intends to consider taking adverse action related to them. . . . The details of that notice . . . have become commonly known as a Rice Notice." *Kean Fed'n of Tchrs. v. Morell*, 233 N.J. 566, 573 (2018).

14

termination, effective July 1, 2017. (ECF No. 81-7, Ex. RR.) In addition, the Board also voted to retroactively approve Plaintiff's medical leave of absence from April 3, 2017 to June 30, 2017. (Pl. SOF 2 ¶ 77.) On July 12, 2017, Plaintiff received an email from Pickus that the Board did not believe there was any "basis for an investigation." (*Id.* ¶ 80.) This assertion was based on Defendants' findings that Plaintiff's discharge was based on poor performance. (*See* Merlino Dep. Tr. 46:3–17; 54:8–56:1.) Thereafter, Plaintiff initiated this lawsuit.

## II.   **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 provides that the Court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must "view[] the facts in the light most favorable to the party against whom summary judgment was entered." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). A "material fact" is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine dispute" about a fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F. 3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

The party moving for summary judgment has the initial burden of establishing its right to summary judgment. *See Celotex Corp.*, 477 U.S. at 323. To show that a material fact is not genuinely disputed, it "must . . . cit[e] to particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The moving party may also meet its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B); *see also Celotex Corp.*, 477 U.S. at 322–23 ("[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case.").

Once the movant meets its threshold burden under Rule 56, the non-moving party must present evidence to establish a genuine issue as to a material fact. *See Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the non-movant "must do more than simply show that there is some metaphysical doubt as to material facts."). Summary judgment should be denied "[i]f reasonable minds could differ as to the import of the evidence." *Anderson*, 477 U.S. at 250–51.

## III.    DISCUSSION

Defendants' and Plaintiff's respective summary judgment briefs overlap because the parties move for judgment on largely the same claims. Defendants move for judgment in their favor on all ten (10) counts. (*See generally*, DSMJ.) Defendants argue that they have set forth a legitimate, non-discriminatory reason for Plaintiff's discharge: poor performance. They argue that Plaintiff has failed to demonstrate that this reason is pretextual, which entitles Defendants to summary judgment on many of Plaintiff's counts. Moreover, Defendants argue that Plaintiff fails to demonstrate any violations of public policy or the state constitution, which further supports

16

judgment for Defendants. Plaintiff, on the other hand, seeks the Court to grant summary judgment on Counts One (1) through Nine (9). Plaintiff argues that Defendants' actions are pervaded with pernicious discrimination against Plaintiff, and such animus demonstrates pretext. Moreover, these actions, Plaintiff alleges, violate public policy. The Court will address each claim below.

A. **ADA AND NJLAD**

In Counts One, Two, and Three, Plaintiff brings claims against all Defendants for violations of the NJLAD and ADA. Specifically, in Count One, Plaintiff alleges that Defendants "discriminated against him on account of his disability" by "failing to reasonably accommodate" him and "unlawfully discharged plaintiff . . . because of a disability or perceived disability. (Compl. ¶¶ 68, 80.) Plaintiff further alleges that Defendants MTPS and MTBOE "also failed to engage in an interactive process with plaintiff to determine whether any reasonable accommodation could be made" and "further failed to provide plaintiff . . . with a reasonable accommodation." (*Id.* ¶¶ 82–83.) In Count Two, Plaintiff claims Defendants violated the ADA by "discriminat[ing] against plaintiff on account of his disability" by "failing to reasonably accommodate plaintiff's disability and terminating plaintiff's employment." (*Id.* ¶ 89.) Finally, in Count Three, Plaintiff alleges that Defendants' "conduct . . . including the termination of [Plaintiff's] employment, [was] in retaliation for [Plaintiff's] exercise and/or enjoyment of rights provided to him under the NJLAD." (*Id.* ¶ 93.) Defendants and Plaintiff both move for summary judgment on these counts.

The ADA and NJLAD both serve to protect employees from unlawful discrimination in the workplace. The ADA was enacted in 1990 "to remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001). Title I of the ADA states that "[n]o covered entity shall discriminate against a qualified individual with a disability

because of the disability of such individual in regard to . . . [the] terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "covered entity" under the ADA includes an "employer," which is "a person engaged in an industry affecting commerce who has 15 or more employees . . . and any agent of such person . . . ." 42 U.S.C. § 12111(2) & (5)(A). Title IV of the ADA prohibits retaliation for exercising the rights guaranteed under Title I of the ADA. It provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Similarly, the NJLAD "guarantees that all citizens be afforded the civil rights promised by the State Constitution" and aims "to secure to handicapped individuals full and equal access to society, bounded only by the actual physical limits that they cannot surmount." *Zive v. Stanley Roberts, Inc.*, 182 N.J. 436, 446 (2005) (quoting *Andersen v. Exxon Co., U.S.A.*, 89 N.J. 483, 495 (1982)).

ADA and NJLAD claims are both analyzed under the three-step burden shifting test laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[12] *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 841 (3d Cir. 2016) (collecting cases). Under this test, a plaintiff must "carry the initial burden under the statute of establishing a *prima facie* case of [unlawful] discrimination," or alternatively, a *prima facie* case of retaliation. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (quoting *McDonnell Douglas*, 411 U.S. at 802). To establish a *prime facie* case for disability retaliation under the ADA and NJLAD, "a plaintiff must show: '(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected

---

[12] Courts evaluate NJLAD and ADA claims under the same standard. *See Guarneri v. Buckeye Pipe Line Servs. Co.*, 205 F. Supp. 3d 606, 614 (D.N.J. 2016). As such, the Court will analyze these claims together.

activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567–68 (3d Cir. 2002) (quoting *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir.1997)). To demonstrate a *prima facie* case for disability discrimination, a plaintiff must show that "(1) he was in the protected group; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he nevertheless was fired; and (4) the employer sought someone to perform the same work after he left." *Valente v. PNC Bank*, No. 20-1710, 2023 WL 5608943, at *4 (D.N.J. Aug. 30, 2023) (citation omitted)).

If the plaintiff establishes a *prima facie* case, "the burden of *production* shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Fuentes*, 32 F.3d at 763 (quoting *McDonnell Douglas*, 411 U.S. at 802) (emphasis in original). This reason, however, "need not . . . actually motivate[] the [employment] decision." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 465 (3d Cir. 2005) (quoting *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000)) (brackets in original). This is because "throughout this burden-shifting paradigm, the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes*, 32 F.3d at 763. Moreover, the Third Circuit has described the employer's responsibility in the second-prong as a "light burden." *Id.*

If the employer proffers "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision," the burden shifts back to the plaintiff to demonstrate "by a preponderance of the evidence that the employer's explanation is pretextual." *Id.* The plaintiff "bears the final burden to demonstrate . . . through evidence that the [employer's] provided rationale is false or that the real reason for the adverse action was discriminatory or retaliatory animus." *Valente*, 2023 WL 5608943, at *4.

A plaintiff may demonstrate pretext in two ways. *See Klimek v. United Steel Workers Loc. 397*, 618 F. App'x 77, 80 (3d Cir. 2015). The plaintiff "must present some evidence 'from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Id.* (quoting *Fuentes*, 32 F.3d at 764). As the Third Circuit has explained:

> To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.

*Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1108–09 (3d Cir. 1997) (quoting *Fuentes*, 32 F.3d at 765). Courts are not a "'a super-personnel department' tasked with correcting unduly harsh employment actions." *Klimek*, 618 F. App'x at 80 (quoting *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir.1995); *see also Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 (3d Cir. 2006) ("The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination." (cleaned up)).

### 1. PLAINTIFF'S *PRIMA FACIE* DISCRIMINATION AND RETALIATION CLAIMS

The Court first addresses Plaintiff's claims for discrimination and retaliation under the NJLAD and ADA. As discussed above, these claims are analyzed under the burden shifting

framework of *McDonnell Douglas*. *See Rich v. State*, 294 F. Supp. 3d 266, 279 (D.N.J. 2018) (collecting cases).

In the case at bar, Defendants do not dispute that Plaintiff has articulated a *prima facie* case of disability discrimination and retaliation under the NJLAD and ADA. (*See* DMSJ at 10, 12.) Regarding Plaintiff's discrimination claim, Defendants admit that Plaintiff "suffers from a disability, as a therapist submitted a medical note indicating that he was unable to work," "he was actually performing the job prior to termination," "he was discharged," and "whatever paraprofessional services may have been needed by Middletown students during the 2017–2018 school year were provided by other paraprofessionals." (*Id.* at 10.)

Likewise, neither party disputes that Plaintiff satisfied his burden for a *prima facie* retaliation claim. In the instant action, for purposes of the subject cross-motions, Defendants again concede that Plaintiff established a *prima facie* case for retaliation. (DMSJ at 12.) Plaintiff requested a medical leave of absence, which his employer acknowledged, and Plaintiff was terminated thereafter. (*Id.*) As such, the Court turns its attention to the second prong of the *McDonnell Douglas* framework.

### 2. DEFENDANT'S NONDISCRIMINATORY JUSTIFICATIONS

Under the second step of the burden-shifting test, the burden shifts to Defendants to set forth a "nondiscriminatory reason for the unfavorable employment decision." *Fuentes*, 32 F.3d at 763. Defendant proffers "poor performance" as the legitimate and nondiscriminatory reason for Plaintiff's dismissal. (DMSJ at 12.)

The record contains a myriad of complaints, recorded both prior and post Plaintiff's medical leave, that exhibit a pattern of poor performance. As discussed above, these include the three instances specifically described by Racioppi in her deposition — (1) where Plaintiff failed

to remain calm during a fire drill; (2) Plaintiff's reaction when a young student grabbed his hair; and (3) when Plaintiff failed to assist Racioppi in restraining a student in crisis. (Racioppi Dep. Tr. 19:11–20:9; 22:8–24:1; 40:3–25; *see also* ECF No. 81-7, Ex. K.) Moreover, Plaintiff's poor performance was documented in Altobello's January 18, 2017 email to Walker. (ECF No. 81-7, Ex. L at -421–22.) Indeed, Altobello noted, *inter alia*, that Plaintiff "does not have the presence necessary to manage the students in the BD program" and even with additional training, Plaintiff "still is having difficulty establishing the presence necessary to be effective." (*Id.* at -421.) Altobello further tendered Plaintiff "Unsatisfactory" or "Needs Improvement" scores in ten (10) out of the seventeen (17) metrics of the draft "Paraprofessional Evaluation" form. (*Id.* at -422.) In what can only be indicia of a non-discriminatory motive, Altobello held this unfavorable review in abeyance in order to give Plaintiff a new assignment and an opportunity to improve his performance. (*Id.* at -421.)

Plaintiff's poor performance continued, however, upon his transfer to Moyer's fifth-grade class room. For example, Moyer testified that "Plaintiff was frequently on his phone during class" and struggled to understand the fifth-grade curriculum. (Moyer Dep. Tr. 67:23–70:16.) Moyer also stated that Defendant "couldn't do the job that he needed to do." (*Id.* at Tr. 95:4–96:8.) Moreover, Newcomb "also voiced concern about Plaintiff's performance." (ECF No. 81-7, Ex. O.) Finally, Plaintiff's attendance record was highly problematic. (*See* ECF No. 81-7, Ex. P.) For example, "[p]rior to Plaintiff's medical leave of absence, he missed 11.5 sick days and 15 unpaid days," meaning that Plaintiff "missed 23.28% of possible work days prior to his medical leave of absence excluding professional and personal days." (*Id.*; *see also* ECF No. 81-7, Ex. Q at -039–40.) In addition, on days when Plaintiff was absent, Altobello testified that Plaintiff failed to follow the

proper procedures for reporting his absences and "there were times that he didn't let anybody know" that he would be absent. (Altobello Dep. Tr. 335:6–12.)

On June 14, 2017, Altobello finalized his "Paraprofessional Evaluation" of Plaintiff for the 2016–2017 School Year. (ECF No. 81-7, Ex. S.) In this review, Altobello noted that during Plaintiff's time in the BD Program, Plaintiff "was incapable of making a successful adjustment from both an academic as well as a behavioral/supervisory role. He has not responded well to suggestion, nor does he follow directions given by the teacher fully resulting in the potential for unsafe environments for the students [i]n the program." (*Id.*) Further, even once Plaintiff was transferred to a new position, Plaintiff, "had difficulties with meeting the task demands of this assignment;" as a result, Altobello did not recommend Plaintiff for rehire for the 2017–2018 school year. (*Id.*) Altobello's recommendation was passed on to Pickus and Shopp in a Monday, June 12, 2017 email. (ECF No. 81-7, Ex. T.) There, Altobello again noted the issues with Plaintiff, including that multiple teachers had approached him with "concerns about [Plaintiff] and his performance." (*Id.*)

Here, Defendants have put forth sufficient evidence for a reasonable factfinder to conclude that Plaintiff's poor performance was a legitimate, nondiscriminatory reason for his discharge. *See D'Alessandro v. City of Newark*, 454 F. App'x 53, 56 (3d Cir. 2011) ("[A] long history of poor performance satisfies the City's burden" under the second prong of *McDonnell Douglas*.); *Valente*, 2023 WL 5608943, at *8 (finding that employee's poor performance constituted a legitimate and non-discriminatory reason for termination).

### 3. PRETEXT

Because Defendants satisfied the second prong of *McDonnell Douglas*, the burden shifts back to Plaintiff to "show by a preponderance of the evidence that the employer's explanation is

pretextual." *Fuentes*, 32 F.3d at 763. As noted above, Plaintiff must either point to evidence such that the factfinder may infer discrimination or establish "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered legitimate reason for termination. *Keller*, 130 F.3d at 1108–09, 1111; *see Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 66 (3d Cir. 1996) (the plaintiff must "demonstrate that the employer's stated reasons were not its true reasons but were a pretext for discrimination" (quoting *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995)). Plaintiff sets forth several arguments in an attempt to demonstrate that Plaintiff's alleged poor performance is mere pretext for disability discrimination and retaliation. The Court addresses each argument in turn.

### a. ALTOBELLO'S PERSONAL ANIMUS

Plaintiff first points to two statements by Altobello that he alleges are evidence of Altobello's personal animus against Plaintiff and thus demonstrate that discrimination motivated Plaintiff's discharge: (1) a January 26, 2017 email in which Altobello wrote he was "hop[ing] for a crime;" and (2) a May 30, 2017 email where he wrote, "I have to do an evaluation in which I will be destroying [Plaintiff]." (Pl. Op. at 16–18.) Plaintiff contends that these emails, and Altobello's testimony regarding same at his deposition "support a jury finding a causal relationship between [Plaintiff's] request for a medical leave of absence and the evaluation Altobello prepared that destroyed [Plaintiff] and resulted in his termination." (*Id.* at 18.)

The Court finds these statements do not prove, by a preponderance of the evidence, that Altobello's recommendation not to renew Plaintiff's contract was the result of disability-based animus. First, the "hope for a crime" comment occurred over five months prior to Altobello's recommendation not to renew Plaintiff's contract, and this time gap thus mitigates any connection

between Altobello's email and Plaintiff's termination.[13] *See Keller*, 130 F.3d at 1112 (finding a "comment [that] occurred four or five months prior to the time when [employer] decided that [Plaintiff] should be discharged" did not demonstrate animus); *Rymas v. Princeton Healthcare Sys. Holding, Inc.*, No. 15-8188, 2017 WL 4858123, at *8 (D.N.J. Oct. 27, 2017) (five months defeated temporal proximity). Second, the comment, whatever it may mean, does not demonstrate disability-based animus. It coincides with Plaintiff's absence from school to assist in the prosecution of a case in which he was the victim of a violent assault. That Altobello would "hope for a crime" appears to be a bad joke for a supervisor to make about his subordinate. Plaintiff fails to make any colorable argument connecting this comment to his disability, as opposed to the prosecution of the perpetrator. While the comment may have been an odd or failed attempt at humor, a reasonable factfinder could not conclude that the comment evidences Altobello's disability-based animus towards Plaintiff.

Altobello's comment that he would "destroy" Plaintiff in his review similarly fails to demonstrate discriminatory animus. This comment, while a poor word choice on the part of Altobello, does not establish that the factfinder could find this comment pretextual for discrimination. Moreover, the evaluation that Altobello ultimately wrote described Plaintiff's poor performance, which in large part relied on concerns and reviews from other teachers about Plaintiff's performance. In short, the comment does not demonstrate pretext nor allow a reasonable factfinder to infer same. *See Fuentes*, 32 F.3d at 765 ("To discredit the employer's proffered

---

[13] On its face, it is difficult to discern what is meant by this singular, off-hand quip. Whether this remark was callous or a poor attempt at humor, it does not relate to any purported disability. Nearly three years later when asked at his deposition about the comment, Altobello could not place the comment in any context or provide any additional information regarding its intent or meaning. (See ECF No. 86-6, Ex. Z at 376:21–379:3.) Even if the Court construed the ambiguous comment as somehow relating to Plaintiff's disability, the single comment here cannot form the basis of Plaintiff's discrimination claim. *See Roebuck v. Drexel Univ.*, 852 F.2d 715, 733 (3d Cir. 1988) (noting past statements "alone" failed to demonstrate discrimination.).

reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.")

Moreover, Plaintiff's own certification rebuts his allegations of Altobello's animus. After Altobello learned of Plaintiff's head injury, he agreed to write a letter of recommendation for Plaintiff to pursue a graduate degree. (ECF No. 89-4, Ex. N.) In addition, throughout Plaintiff's employment, Altobello recommended Plaintiff receive additional training for his role as a paraprofessional. (ECF No. 86-6, Ex. V.) That Altobello took steps to support Plaintiff's professional development after he learned about Plaintiff's disability is inconsistent with disability-based animus. *See Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 414 (3d Cir. 1999) (holding Plaintiff failed to establish pretext where the plaintiff failed to offer evidence demonstrating pretext outside of "numerous allegations in his affidavit which he predicates on nothing more than his beliefs"); *Barnes v. Off. Depot, Inc.*, No. 08-1703, 2009 WL 4133563, at *10 (D.N.J. Nov. 24, 2009) (finding it "significant that soon after Plaintiff told supervisors [about her protected status][,] she received a pay increase").

### b. TIMING OF PLAINTIFF'S DISCHARGE

Plaintiff next argues that the "[a]dverse action taken contemporaneously with engaging in protected activity" demonstrates that Defendants' asserted justification for Plaintiff's termination was pretextual. (Pl. Op. at 18.) Specifically, Plaintiff points to the following events: (1) On June 5, 2017, Plaintiff requested an extension for his leave of absence on the same day that Altobello began to work on his evaluation of Plaintiff; (2) Shopp directed Altobello to include in his evaluation that he did not recommend Plaintiff "for rehire in the district for the 2017–2018 school

year;" (3) Plaintiff raised concerns about discrimination and retaliation; and (4) Altobello finalized his evaluation. (*Id.*)

The Court is not persuaded that this timeline of events demonstrates that Defendant's poor performance rationale was pretextual. First, Plaintiff's poor performance issues began early into the school year in Racioppi's classroom. (*See, e.g.*, Racioppi Dep. Tr. 19:11–20:9.) Altobello's January draft evaluation documented these performance issues and recommended that Plaintiff be transferred to a new classroom. (ECF No. 81-7, Ex. L.)

Second, upon transfer to a new role for the second half of the school year, Plaintiff's performance issues continued, as both Newcomb and Moyer testified to in their depositions. (*See e.g.*, Moyer Dep. Tr. 67:23–70:16; Newcomb. Dep. Tr. at 44: 8–10.) The record demonstrates that Plaintiff's problematic performance issues began well before Plaintiff first and then repeated requests for medical leave.

Moreover, the timing of Plaintiff's discharge does not bespeak discrimination. All paraprofessionals are non-renewed at the end of the year. (Pl. SOF 2 ¶ 8.) Plaintiff fails to demonstrate how Plaintiff's non-renewal, which coincided with the end of school year, was pretext for discrimination. This timing is mandated by the MTBOE policies, which require that "paraprofessionals . . . shall be notified of renewal or nonrenewal on or before May 15 of each year." (ECF No. 81-7, Ex. EE.) Plaintiff's supposition alone that the timing, which was around the time he requested medical leave, is insufficient to establish pretext. *See Jones*, 198 F.3d at 414.

Plaintiff's proffered timeline fails to contest any of the performance issues that Defendants set forth, and thus fails to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d at 765

(quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1992) (emphasis in original)). Moreover, "[q]uestioning the timing of these complaints, without more, cannot suffice to establish pretext." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 474 (3d Cir. 2005). Plaintiff's suggestion that he was terminated in close proximity to his medical leave does not allow a reasonable factfinder to infer that the discharge was pretext for discrimination or retaliation, especially since his assertion does not challenge any of the evidence of his poor performance.

### c. ALLEGED INCONSISTENCIES

Plaintiff next points to alleged inconsistencies in the testimony of Altobello and the teachers with whom Plaintiff worked — Racioppi, Newcomb, and Moyer — to demonstrate pretext. (Pl. Op. at 19–21.) Particularly, Plaintiff alleges that Altobello and the three teachers changed their tune on Plaintiff's performance only after learning of Plaintiff's disability. (*Id.*) Plaintiff first points to Altobello's May 24, 2016 review in which he gave Plaintiff positive reviews, and argues that only after learning about Plaintiff's disability did Altobello begin to negatively assess and critique Plaintiff's performance. (*Id.* at 19.) Plaintiff summarizes his position as follows: "Everything changed for [Plaintiff] the following school year when defendants learned of his head injury, disability and his need for medical leave. Defendants determined that they were going to terminate [Plaintiff's] employment." (*Id.* at 1.)

However, that Altobello gave Plaintiff one positive review, and then negative reviews after supposedly learning of his disability does not demonstrate pretext for discrimination or disability-related animus. *Kautz*, 412 F.3d at 474 (stating that "us[ing] past positive performance reviews to show that more recent criticism was pretextual fails as a matter of law"); *Ezold*, 983 F.2d at 528 ("Pretext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations."). Altobello's

subsequent negative performance review is not tantamount evidence of pretext. *See Rymas*, 2017 WL 4858123, at *8. As stated, Plaintiff's first review occurred less than one month into his employment, hardly a sufficient time period to establish Plaintiff's ability to perform tasks as a paraprofessional. Defendants' testimony produced clear support that negative reviews demonstrated ongoing and significant performance deficiencies that occurred after Plaintiff had been working for a longer period of time and in multiple classrooms. Defendants' position bespeaks consistency; Plaintiff performed well in the first few weeks of employment, but thereafter and throughout this first fully year struggled, beginning in his time in the BD program. As such, Defendants transferred Plaintiff to a paraprofessional role as a one-to-one aide. However, Plaintiff continued to fail to perform up to par, and therefore, he was not renewed for future employment.

Plaintiff also points to alleged inconsistencies in statements by the teachers with whom Plaintiff works. (Pl. Op. at 20–21.) Plaintiff contends that "[t]he teachers [Plaintiff] worked with gave him 'great feedback' and he 'was always praised upon about my work and told I was doing well.'" (*Id.* at 21 (quoting Pezza Dep. Tr. 99:10–25).)[14] In addition, Plaintiff asserts that neither Newcomb nor Moyer "ever indicated to [Plaintiff] that he was not performing his job responsibilities well." (*Id.*)

These alleged inconsistencies fail to establish pretext. First, Plaintiff points only to his own certification and deposition testimony in which he denies that Defendants' proffered examples of poor performance occurred. (See *Id.* at 19–21; "Pezza Cert.," ECF No. 89-2.) "[A] plaintiff cannot use conclusory denials of his or her own inappropriate conduct to create a genuine issue of material fact." *Bals v. Trump Nat'l Golf Club Colts Neck LLC*, No. 14-6055, 2016 WL 7325475, at *11 (D.N.J. Dec. 16, 2016); *Ade v. KidsPeace Corp.*, 401 F. App'x 697, 703 (3d Cir. 2010) ("A denial

---

[14] The Court notes that the parties failed to attach this portion of Plaintiff's deposition.

that he engaged in the conduct for which he was purportedly terminated is insufficient to create a genuine issue of material fact."); *Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458, 460 (3d Cir. 1989) ("[A] nonmoving party in such a case cannot defeat summary judgment simply by asserting that a jury might disbelieve an opponent's" testimony and noting that the plaintiff typically must put forward evidence to establish a dispute of material fact); *Jorrin v. Lidestri Foods, Inc.*, No. 11-2064, 2013 WL 1316160, at *13 (D.N.J. Mar. 28, 2013) (noting that "conclusory, self-serving denials are insufficient to demonstrate that [Defendant's] legitimate, non-retaliatory reason was a pretext"). Plaintiff's blanket denials of his poor performance, without any additional facts or plausible inferences, fail to demonstrate pretext in the work assessments of Plaintiff by Racioppi, Newcomb, or Moyer.

Next, Plaintiff contends that "[n]either Ms. Newcomb nor Ms. Moyer ever indicated to [Plaintiff] that he was not performing his job responsibilities well." (Pl. Op. at 21.) Again, this does not demonstrate pretext, as it neither discredits either teachers' testimony that Plaintiff struggled in his job nor allows a reasonable factfinder to believe that disability-based pretext motivated their actions. *Fuentes*, 32. F.3d at 763. An alleged lack of work performance feedback is not indicia of discriminatory pretext. As the Third Circuit has explained, courts are not a "super-personnel department" to correct purported mismanagement by an employer. *Keller*, 130 F.3d at 1111 ("conclud[ing] that a reasonable factfinder could draw only a relatively weak inference" based on an employers' failure to "express criticism to those employees"); *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1216 (3d Cir. 1988) ("The company is under no obligation to warn plaintiff of complaints regarding his performance and, if anything, the effect of such evidence is

equivocal, perhaps indicating that plaintiff was receiving the benefit of the doubt." (citation omitted)).[15]

Finally, the fact that Altobello asked Racioppi, Newcomb, and Moyer to write evaluations of Plaintiff's performance after Plaintiff provided notice of his intent to sue fails to establish that Defendants' nondiscriminatory reason for discharge is pretextual.[16] It is not this Court's role to opine on whether an employer's decision to document performance deficiencies on an ongoing, real-time basis is a preferable managerial policy, and the fact that Plaintiff's performance issues were documented after the fact is not indicia of falsity or pretext for disability related discrimination. *See Fuentes*, 32 F.3d at 766 (noting that an employer's "post-decision" documentation of its reasons for not hiring plaintiff "display[ed] business acumen" as "[g]iven the frequency of employment discrimination suits, an employer which documents its reasons for taking adverse employment actions can often be more suitably described as sensible than as devious").

Moreover, these reviews were not post hoc fabrications of poor performance. In Altobello's January draft evaluation and email to Walker, in which he recommended transferring Plaintiff to

---

[15] Further, both Racioppo and Moyer testified independently to providing Plaintiff with informal feedback to improve and address his performance deficiencies. (*See* Racioppi Dep. Tr. at 41:13–42:13; Moyer 67:23–68:20.)

[16] In his certification in support of Plaintiff's Opposition Brief, Plaintiff takes issue with Racioppi's use of the term "flapping" to describe Plaintiff's response to a fire drill. (*See* Pezza Cert. at ¶¶ 3–4.) Even assuming *arguendo* that the word choice may be viewed as inartful and not commonly accepted verbiage under contemporary standards, the Court does not find this comment to rise to a sufficient level to demonstrate animus motivating all of Racioppi's actions. *See Keller*, 130 F.3d at 1112 (finding that where defendant's "words certainly constitute evidence from which a reasonable factfinder could draw an inference of age-based animus, [the Court did] not think that these words alone could reasonably be viewed as sufficient to prove by a preponderance of the evidence that age was a determinative cause of Keller's subsequent termination"); *Ezold*, 983 F.2d at 545 ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."); *Jones*, 198 F.3d at 414 (finding that "allegations in [plaintiff's] affidavit which he predicates on nothing more than his beliefs without having actual knowledge of them" failed to establish pretext).

a new classroom, he indicated that Plaintiff's performance in the BD program was problematic and concerning according to Racioppi. (ECF No. 81-7, Ex. L.) Moreover, Altobello's final evaluation for Plaintiff again relied on input from multiple teachers. (*See* ECF No. 86-8, Ex. AAA.) A reasonable jury could not conclude that Defendant's justification of poor performance was "weak, implausible, inconsistent, incoherent, contradictory or otherwise a pretext" for ending Plaintiff's employment. *Bals*, 2016 WL 7325475, at *13.

### d. LACK OF WRITTEN DOCUMENTATION

To further undermine Defendants' proffered justification for his discharge, Plaintiff next points to a "lack of contemporaneous written documentation of any deficiencies in plaintiff's performance." (Pl. Op. at 21.) First, Plaintiff cites to the deposition testimony from Altobello, in which he states he does not recall any written evaluations of Plaintiff's performance. (*Id.*) Second, Plaintiff argues that Altobello's failure to "counsel[] or discipline[]" Plaintiff for his poor attendance record, nor "advis[e]" Plaintiff in writing about these issues further supports a finding of pretext. Third, Plaintiff cites to deposition testimony by Racioppi, Moyer, and Newcomb in which they testified that they did not complete written evaluations of Plaintiff's performance during the school year, keep written notes of his performance issues, or advise Plaintiff of their concerns. (*Id.* at 22–24.)

This, by itself, fails to demonstrate pretext. While written records of Plaintiff's performance issues from his supervisors may have been helpful, the lack of any records does not disprove that Plaintiff failed to adequately perform in his job. Defendants have introduced ample uncontroverted evidence, in the form of deposition testimony and documents, that Plaintiff continued to struggle to perform in his role as a paraprofessional throughout the school year. Racioppi, Moyer, and Newcomb each testified to his issues, as did Altobello, who noted these

performance concerns in emails to Walker, as well as draft and published evaluations. As discussed above, while written documentation may have been a preferable practice, an employer is not required to give feedback to its employee. *Keller*, 130 F.3d at 1111; *Healy*, 860 F.2d at 1216. As such, the lack of written documentation, without more, fails to show that Defendants' purported rationale was pretextual.

### e. IMPARTIAL AND UNFAIR

Plaintiff next states that that the "[l]ack of fairness or partiality" in the process evinces Defendants' pretextual basis for Plaintiff's discharge. Specifically, Defendant points to Altobello's May 18, 2017 email in which Altobello noted that the process will be "neat and clean." (Pl. Op. at 24.) Plaintiff also points to a June 8, 2017 email from Pickus to Altobello in which she forwards a note from a teacher looking for a job, which she explains she sent to him "knowing [he's] getting rid of Pezza." (*Id.*) These statements fail to elucidate "weaknesses, implausbilties, inconsistencies, incoherences, or contradictions" in Defendants' position or demonstrate that "unlawful discrimination was more likely than not a motivating or determinative cause" of the discharge. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 647–49 (3d Cir. 2015) (citation omitted). Neither of these comments support an inference of pretext, nor do they rebut Defendants' assertion that Plaintiff performed poorly. First, Altobello's statement that Plaintiff's discharge would be "neat and clean" fails to evidence disability-based animus on the part of Altobello. The ambiguous comment makes no reference to Plaintiff's disability, nor is it in a context that would enable a factfinder to infer that Altobello is referencing Plaintiff's disability. *See Keller*, 130 F.3d at 1112. The same holds true for Pickus. In her email to Altobello, she makes no reference to Plaintiff's purported disability, and her comments fail to give rise to an inference of discrimination. She simply states she is aware that Plaintiff's employment will not be renewed — a statement that

is factually accurate and neutral. As such, these comments do not demonstrate that Defendants' proffered reason for discharge, poor performance, is pretext.

## B. PLAINTIFF'S FAILURE TO ACCOMMODATE CLAIM

The Court next turns to Plaintiff's failure to accommodate claims under the ADA and NJLAD. In their Motion of Summary Judgment, Defendants argue that the "Complaint is devoid of facts suggesting that Plaintiff requested a workplace accommodation or assistance for a disability," nor was it clear through discovery that Plaintiff requested one. (DSMJ at 20.) Defendants also argue that to the extent Plaintiff's request for FMLA leave or his request to not participate in restraining students in holds somehow could be construed as requests for accommodations or assistance under the NJLAD, Defendants granted these requests. (*Id.*) In response, Plaintiff points to a request he made in a May 4, 2017 email to Garofolo. (ECF No. 89-5, Ex. NN.)[17] When discussing Plaintiff's leave of absence, Plaintiff asked if he was eligible for "short term disability" payments while out on leave. (*Id.*)  In response, Garofolo stated they, the school, "don't subscribe to state disability." (*Id.*) Plaintiff contends this email was Plaintiff's request for an accommodation, such that Defendants were thus obligated to engage in the interactive process to accommodate Plaintiff's disability. (Pl. Op. at 36.)

To succeed on a failure to accommodate claim, a plaintiff must establish four elements: "(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated." *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006); *Valente*, 2023 WL 5608943, at *5 (D.N.J. Aug. 30, 2023).[18] "[T]he employee [must] initiate the

---

[17] This, of course, as stated herein at page twelve (12), was <u>after</u> Plaintiff was notified, in writing, that his employment would not be renewed for the next year.

[18] These requirements apply to claims under both the ADA and NJLAD. *Armstrong*, 438 F.3d at 246 n.12.

request for [a] reasonable accommodation." *Linton v. L'Oreal USA*, No. 6-5080, 2009 WL 838766, at *4 (D.N.J. Mar. 27, 2009). While there is no "formal mechanism or 'magic words,' to notify an employer" of an accommodation request, "either by direct communication or other appropriate means, the employee 'must make clear that [he/she] wants assistance for his or her disability.'" *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 332 (3d Cir. 2003) (quoting *Jones v. United Parcel Serv.*, 214 F.3d 402, 408 (3d Cir. 2000) (brackets in original)).

In the case at bar for purposes of the subject motions, Defendants do not contest that Plaintiff suffered from a disability. (*See* DMSJ at 10.) However, Plaintiff fails to satisfy the remaining three prongs. In his opposition brief, Plaintiff alleges that his email to Garofolo, in which he asked Defendants his eligibility for short term disability, evidences his request for an accommodation. (Pl. Op. at 35–36; *see also* ECF No. 89-5, Ex. NN.) Inquiring about the prospect of receiving short term disability financial benefits is not tantamount, by implication or inference, to seeking an accommodation at work for a disability, as Plaintiff failed to "make clear that the employee wants assistance for his or her disability." *Taylor*, 184 F.3d at 313. On point, the Third Circuit has found that an employee did not make a request for a reasonable accommodation where "the only request made by [plaintiff] to [defendant] was for continued payment of disability benefits." *United Parcel Serv.*, 214 F.3d at 408. The Circuit Court explained that the plaintiff "never requested an accommodation or assistance for his disability; he not only never requested to return to his old position as a package car driver, he never asked for either one of the other jobs available under his union contract or any other position with UPS." *Id.*

Likewise, in the instant case, Plaintiff only asked if he was eligible for disability payments while out on leave.[19] Short term disability provides income to certain employees while on leave. *See Alvares v. Montell USA Inc.*, 101 F. App'x 881, 883 (3d Cir. 2004). Plaintiff did not request a transfer to a new classroom, reduced hours or duties, or a new role. Thus, Defendants were not on notice that Plaintiff sought a reasonable accommodation, and thus, had no duty to engage Plaintiff to find a reasonable accommodation. *See Conneen*, 334 F.3d at 333 (holding that defendant "cannot be held liable for failing to read [Plaintiff's] tea leaves"); *Devico v. Genesis Healthcare, LLC*, No. CV 17-7556, 2019 WL 6318636, at *8 (D.N.J. Nov. 26, 2019) (holding that while the plaintiff "provided Defendants with various, unspecified medical records . . . there is no record evidence that those documents were accompanied by any suggestion that Plaintiff needed an accommodation, or any request that Plaintiff's employer do anything with respect to Plaintiff's health conditions").

Moreover, as discussed above, Plaintiff's five doctor's notes are devoid of any requests for an accommodation, or restrictions that should be placed on Plaintiff's day-to-day role. (*See* ECF No. 86-7, Exs. II, JJ, LL, QQ, WW.) The notes, at most, state that Plaintiff was not capable of working and advised that he should take a leave of absence. (*See* ECF No. 86-7, Ex, LL.) Of note, Plaintiff's first doctor's note, dated April 4, 2017, explicitly notes that Plaintiff has no activity restrictions at present. (ECF No. 86-7, Ex. II.) Defendants granted all of Plaintiff's leave requests, and subsequent leave requests thereafter. (Pl. SOF 1 at *33, Pl. SOF 2 ¶¶ 48, 77, ECF No. 86-7, Ex. QQ.)

---

[19] In addition, the Court finds that, to the extent Plaintiff's request for medical leave can be construed as a request for a reasonable accommodation, Defendants in fact accommodated Plaintiff. *See Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 157 (3d Cir. 2017) ("[E]ven assuming, *arguendo*, that Capps' requests for intermittent FMLA leave constituted requests for a reasonable accommodation under the ADA as well, Mondelez continued to approve Capps' requested leave, and indeed, Capps took the requested leave. Thus, Mondelez provided and Capps received the accommodation he asked for.")

The Court finds that Plaintiff failed to adequately request an accommodation, and thus, the Court grants Defendants' motion for summary judgment on Plaintiff's ADA and NJLAD failure to accommodate claims. *See Linton*, 2009 WL 838766, at *6 ("Something more is required of an employee under the NJLAD than merely apprising her employer that she is still injured to start the interactive process for seeking an accommodation; the employee must at least arguably seek assistance to survive summary judgment."); *cf. Rooney v. NVR, Inc.*, No. 18-10670, 2020 WL 1864609, at *13 (D.N.J. Apr. 13, 2020) (finding Plaintiff adequately requested an accommodation where the doctor's note stated plaintiff's limitations, which included limits to his mobility, and thus defendants were "put on notice of his restrictions"). Therefore, the Court grants Defendants' Motion for Summary Judgment on Counts One, Two, and Three, and denies Plaintiff's Motion on same.

## C.  AIDING AND ABETTING CLAIM

The Court next turns to Count Four, in which Plaintiff brings an aiding and abetting discrimination claim in violation of the NJLAD against Defendants Altobello, George, Pickus, Gallagher, Shopp, a business administrator for MTPS, Garafalo, an employee in Human Resources for MTBOE, and Magistro. (*See* Compl. ¶ 98.) Plaintiff argues that these individuals had "the ability to control the terms and conditions of [Plaintiff's] employment", and "set out to destroy plaintiff's reputation, intentionally interfere with his employment and prospective economic advantage." (*Id.* ¶¶ 99, 101.) Moreover, Plaintiff argues they "abused the authority delegated by defendant [MTPS and MTBOE] when they discriminated and retaliated against [Plaintiff] and altered the workplace by terminating his employment while he was on medical leave." (*Id.* ¶ 104.)

Defendants move for summary judgment on this claim. (DSMJ at 21.) In support, Defendants argue that they cannot be held liable for aiding and abetting a NJLAD violation where

"no violation of the NJLAD occurred." (*Id.*) In addition, Defendants contend that they cannot be "held liable as an 'aidor and abettor' based on the conduct that forms the basis of the underlying claim," and no Defendant engaged in the "active and purposeful" conduct required under the law. (*Id.* at 21–22.) In opposition, Plaintiff points to many of the same examples of alleged pretext discussed above to establish that Defendants aided and abetted "each other in their discrimination and retaliation against plaintiff." (Pl. Op. at 37.) Plaintiff argues, *inter alia*, that he was terminated without cause and Defendants "all conspired with Altobello to deprive [Plaintiff] of his rights and to terminate his employment." (*Id.* at 38.) Plaintiff also avers that Altobello's comments in which he "hope[d] for a crime" and stated he would "destroy" Plaintiff, Pickus's reference to Altobello "getting rid" of Plaintiff, and the post-hoc reviews by Racioppi, Moyer, and Newcomb illustrate the vast collusion to terminate Plaintiff. (*Id.*)

The NJLAD makes it unlawful "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so." N.J. Stat. Ann. § 10:5-12(e). To establish a claim for aiding and abetting discrimination under the NJLAD, a "plaintiff must show that: (1) the defendant aided a party who performed a wrongful act that caused an injury; (2) the defendant was 'generally aware of his role as part of an overall illegal or tortious activity at the time he provided assistance;' and (3) defendant knowingly and substantially assisted the principle violation." *Amentler v. 69 Main St., LLC*, No. 08-351, 2012 WL 28194, at *13 (D.N.J. Jan. 3, 2012) (quoting *Tarr v. Ciasulli*, 181 N.J. 70, 853 A.2d 921, 929 (N.J. 2004)). The aider, therefore, must "know[] that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other." *Tarr*, 181 N.J. at 84 (quoting Restatement (Second) of Torts § 876(b) (1979)).

New Jersey courts have applied a five-factor test to determine whether an aider provides "substantial assistance." *Id.* The factors are: "(1) the nature of the act encouraged, (2) the amount of assistance given by the supervisor, (3) whether the supervisor was present at the time of the asserted harassment, (4) the supervisor's relations to the others, and (5) the state of mind of the supervisor." *Id.* A "supervisor . . . *can* be held liable for aiding and abetting his employer's wrongful conduct, even where the only bad conduct at issue is the supervisor's own conduct." *Brown-Marshall v. Roche Diagnostics Corp.*, No. 10-5984, 2013 WL 3793622, at \*7 (D.N.J. July 19, 2013) (citing *Rowan v. Hartford Plaza Ltd.*, No. L–3106–09, 2013 WL 1350095, at \*8 (N.J. Super. Ct. App. Div. Apr. 5, 2013) (emphasis in original)).

Here, Defendants cannot be found liable for aiding and abetting because, as discussed above, the Court held that Plaintiff failed to establish Defendants violated the NJLAD. *See Hanani v. State of N.J.*, No. 3-3111, 2005 WL 1308231, at \*16 (D.N.J. May 31, 2005), *aff'd sub nom.* 205 F. App'x 71 (3d Cir. 2006) (concluding aider and abettor not liable where no principal violation found).[20] As such, the Court grants Defendants' Motion for Summary Judgment with respect to the aiding and abetting claims and denies Plaintiff's Motion.

---

[20] Moreover, Plaintiff does not demonstrate that Defendants provided "substantial assistance." With respect to Altobello, as discussed above, the Court found that his conduct did not give rise to a finding of discrimination; because it did not meet that standard, his conduct also fails to give rise to an aiding and abetting claim. While the comments may have been arguably inartful, they did not demonstrate disability-based animus or demonstrate his involvement in a plot to terminate Plaintiff because of his disability. Moreover, Plaintiff's arguments that other Defendants aided discrimination and retaliation also fail. Plaintiff asserts that George "recommended [Plaintiff's] termination without good and sufficient cause"; the Court has already held that Defendants proffered a legitimate and non-discriminatory reason for Plaintiff's discharge. Further, Plaintiff's assertions that Pickus, Gallagher, Shopp, Garofalo, Magistro "conspired with Altobello" must also be rejected. Their actions, which included reviewing an evaluation, noting that Plaintiff's employment was not being renewed, or emailing Plaintiff to let him know that MTPS does not provide short term disability, fail to demonstrate substantial assistance. Plaintiff fails to show that these Defendants were aware of any alleged conspiracy to discharge Plaintiff, *Amentler*, 2012 WL 28194, at \*13, or establish that they knew Altobello's conduct was discriminatory. *Tarr*, 181 N.J. at 84.

### D. **FMLA INTERFERENCE**

In Counts Five and Six, Plaintiff asserts claims for violations of the FMLA. Particularly, Plaintiff alleges that Defendants interfered with his FMLA leave and the entitlements to which he was permitted upon return. (*See* Compl. ¶¶ 105-26.) Plaintiff alleges that Defendants "fired [Plaintiff] while he was on medical leave and at the same time [they] extended his medical leave and based upon that undisputed fact, [Plaintiff] is, therefore, entitled to judgment as a matter of law. (PMSJ at 3–4.) Defendants, however, counter that Plaintiff's three requests for medical leave were granted. (DMSJ at 25.) Because Defendants granted such requests, they are, Defendants assert, not liable for FMLA interference. (*Id.*)

A plaintiff may assert a claim under the "entitlement, or interference, theory . . . based on the prescriptive sections of the FMLA which create substantive rights for eligible employees." *Parker v. Hanhemann Univ. Hosp.,* 234 F. Supp. 2d 478, 485 (D.N.J. 2002).[21] The FMLA grants an "eligible employee . . . a total of twelve workweeks of leave during any twelve month period' if the employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Conoshenti v. Pub. Serv. Elec. & Gas Co.,* 364 F.3d 135, 141 (3d Cir. 2004) (quoting 29 U.S.C. § 2612(a)(1)(D)). Following their leave, "the employee is entitled to be reinstated to his or her former position, or an equivalent one." (*Id.*) However, this right is not absolute; "[t]his right to reinstatement is qualified by a statutory directive that it does not entitle a restored employee to a right, benefit or position to which the employee would not "have been entitled had the employee not taken the leave." *Id.* (quoting 29 U.S.C. § 2614(a)(3)(B)); *Wolpert v. Abbott Lab'ys*, 817 F. Supp. 2d 424, 438 (D.N.J. 2011) (noting that

---

[21] The Honorable Douglas E. Arpert, U.S.M.J., ordered that "Defendants are estopped from denying that Plaintiff was qualified for FMLA-protected leave." (*See* ECF No. 80.)

an "employee will not be entitled to [job] restoration" when the employer demonstrates the employee would have been terminated irrespective of the leave); *Ellison v. B.J.'s, Inc.*, No. 06-4977, 2007 WL 3395831, at *11 (D.N.J. Nov. 8, 2007) (stating that that a plaintiff "[is] not immunized from adverse employment decisions unrelated to his protected activity").

In the case at bar, Defendants have demonstrated that Plaintiff would have been discharged notwithstanding Plaintiff's FMLA leave. Defendants have put forward significant evidence demonstrating Plaintiff's poor performance. Therefore, Defendants have demonstrated that Plaintiff "'would have been laid off during the FMLA leave period' independent of the employee's FMLA leave," and therefore, Plaintiff "is not entitled to restoration." *Saari v. Mitre Corp.,* No.-153295, 2017 WL 1197756, at *15 (D.N.J. Mar. 30, 2017) (quoting 29 C.F.R. § 825.216(a)(1))).

Plaintiff also alleges "interference" with his FMLA rights under 29 U.S.C. § 2615(a)(1). To establish an FMLA interference claim, Plaintiff "must show (1) [Plaintiff] was entitled to take FMLA leave . . . ; and (2) [Defendants] denied [Plaintiff's] right to do so." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 312 (3d Cir. 2012). Plaintiff has to demonstrate "that FMLA benefits were actually withheld." *Id.* In the instant action, Plaintiff requested, and was granted medical leave, and two subsequent extensions, by Defendants. (*See* Pl. SOF 2 ¶¶ 48, 50, 55, 77.) Therefore, Defendants did not interfere with Plaintiff's FMLA requests. See *Saari,* 2017 WL 1197756, at *15 (granting summary judgment for defendant where plaintiff was approved for and took FMLA leave but was terminated while on leave). As such, the Court grants Defendants' Summary Judgment on Counts Five and Six and denies Plaintiff's Motion.

E. **FMLA RETALIATION**

Plaintiff asserts FMLA retaliation claims in Counts Seven and Eight. Plaintiff alleges that "[a]s a direct consequence of [Plaintiff] exercising his rights under the [FMLA] . . . [Defendants]

retaliated against [Plaintiff] by deriving and orchestrating a pretextual plan to terminate [Plaintiff]. (Compl. ¶ 145.) Plaintiff again cites to the fact that Plaintiff was terminated while on leave as evidence that Plaintiff is entitled to judgment on this claim. (*See* PMSJ at 8.) In support of their motion for summary judgment, Defendants argue that Plaintiff cannot carry his burden to establish a *prima facie* retaliation claim. (DMSJ at 26.) Alternatively, Defendants argue that they have satisfied their burden under *McDonnell-Douglas*, and Plaintiff has failed to demonstrate pretext. (*Id.* at 27.)

To succeed on a claim for FMLA retaliation, a plaintiff must first establish a *prima facie* retaliation claim by demonstrating that "(1) he exercised his rights under the FMLA; (2) he was subject to an adverse employment decision; and (3) the adverse decision was causally related to his leave." *Saari*, 2017 WL 1197756, at *16. If a plaintiff can prove a *prima facie* case, "the burden shifting framework articulated in *McDonnell Douglas Corp. v. Green* applies." *Santosuosso v. NovaCare Rehab.*, 462 F. Supp. 2d 590, 597 (D.N.J. 2006); *Parker*, 234 F. Supp. 2d at 492. As such, "[t]he burden then shifts to Defendants to establish a legitimate, non-discriminatory reason for the employment actions," and if Defendants do so, "the burden shifts back to Plaintiff to offer sufficient evidence that the reason offered by Defendants was a pretext for retaliation." *Santosuosso*, 462 F. Supp. 2d at 596–97.

Assuming *arguendo* that Plaintiff satisfies his *prima facie* burden, Plaintiff again fails to rebut Defendant's legitimate, non-retaliatory reason for ending Plaintiff's employment: poor performance. As discussed in detail above, Defendants proffered a justification for Plaintiff's discharge, which Plaintiff failed to rebut or demonstrate was pretextual. Plaintiff recycles largely the same arguments to demonstrate pretext for the FMLA retaliation claim as he did for the NJLAD and ADA retaliation claims. Plaintiff advances one new argument — that "the Board terminated

[Plaintiff] on the same day it approved an extension to his medical leave of absence." (Pl. Op. at 41.) Plaintiff is not immune from termination on the basis of his protected leave, so long as Defendant's reason for termination is unrelated to the leave. *See Saari,* 2017 WL 1197756, at *15. Plaintiff has failed to refute Defendants' evidence of his poor performance, and the fact that his termination occurred on the same day he was terminated does not demonstrate retaliation. As such, Plaintiff has failed to demonstrate the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendants' justification. *Fuentes*, 32 F.3d at 765. The Court grants Defendants' summary judgment on Counts Seven and Eight and denies Plaintiff's Motion.

F.  **NEW JERSEY CIVIL RIGHTS ACT**

In Count Nine, Plaintiff asserts a violation of the New Jersey Civil Rights Act ("NJCRA"). (Compl. ¶ 154.) Plaintiff alleges that he "was deprived of his right to substantive due process and/or equal protection and/or substantive rights, privileges and immunities secured the Constitution and/or the laws of this State." (*Id.* at 155.) Both Plaintiff and Defendants moved for summary judgment on this point. Plaintiff argues that "[b]y hand-delivering [Plaintiff] a Rice Notice on July 23, 2017, the day after defendants provided [Plaintiff] the address for [Plaintiff's] Notice of claim, defendants 'interfered with or attempted to . . . interference [sic] with' by threats, intimidation or coercion [Plaintiff's] substantive rights, privileges or immunities." (PMSJ at 20.) In support, Plaintiff points to an email from Jeffrey Merlino in which he directs the Board to have "no discussion [of Plaintiff's discharge]-just the resolution terminating his at will employment." (ECF No. 81-7, Ex. HH; *see also* Pl. Reply at 4.) Plaintiff also argues that Defendants violated the Collective Bargaining Agreement, and in doing so, violated the NJCRA. (*Id.* at 21.) In their Motion for Summary Judgment, Defendants argue that Plaintiff fails to identify any Constitutional violations, federal or state, and as such, Plaintiff's claim fails as a matter of law. (DSMJ at 31.)

Moreover, Defendants argue that Plaintiff fails to demonstrate how Defendants' conduct violates any Constitutional guarantees. (Def. Opp. at 17–18.)

Plaintiff's arguments concerning Defendants' violations of the NJCRA are not a model of clarity. At the outset, the Courts notes that the NJCRA provides a cause of action for:

> [a]ny person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

N.J. Stat. Ann. § 10:6-2(c).  A claim under the NJCRA is similar to that of a Section 1983 claim under the federal Constitution. See *Chapman v. New Jersey*, No. 08–4130, 2009 WL 2634888, *3 (D.N.J. August 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart."). The NJCRA, however, unlike its federal compliment, "protects invasions of substantive due process, not procedural due process." *Major Tours, Inc. v. Colorel*, 799 F. Supp. 2d 376, 405 (D.N.J. 2011).

To make out a substantive due process claim, "a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience." *Chambers ex rel. Chambers v. Sch. Dist. Of Philadelphia Bd Of Educ.*, 587 F.3d 176, 190 (3d Cir. 2009) (citations omitted). Any substantive due process claim that Plaintiff was deprived of his job fails because "an employee hired at will has no protected interest in his employment and may not prevail on a claim that his or her discharge constituted a violation of property rights." *Morgan v. Union Cnty. Bd. of Chosen Freeholders*, 633 A.2d 985, 993 (N.J. Super. Ct. App. Div. 1993). Here, Plaintiff is a non-tenured employee, subject

to at-will employment. As such, Plaintiff does not have a substantive due process right to his employment.[22]

In his Reply Brief, Plaintiff for the first time suggests that Defendants retaliated against him in violation of his free speech rights.[23] (Pl. Reply at 5.) To assert a free speech claim under the New Jersey Constitution, a plaintiff must show: (1) "the activity in question was protected" such that "the speech must involve a matter of public concern"; (2) plaintiff's "interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees;" and (3) "the protected activity was a substantial or motivating factor in the alleged retaliatory action." *Lapolla v. Cnty. of Union*, 157 A.3d 458, 469 (N.J. Super. Ct. App. Div. 2017) (quoting *Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d Cir. 2001)). If the plaintiff satisfies this burden, the defendant "can rebut the claim by demonstrating 'it would have reached the same decision . . . even in the absence of the protected conduct.'" (*Id.* (quoting *Baldassare* 250 F.3d at 195)).

In the case at bar, Plaintiff's claim fails as a matter of law. First, Plaintiff cannot satisfy the first prong of the three-part test, as Plaintiff fails to complain about matters of public concern. Plaintiff's "lawsuit essentially concerns an employment dispute rather than a matter of public concern" and Plaintiff's requested remedies "are limited to relief designed to rectify employment actions he contends were adverse to him." *Lapolla*, 157 A.3d at 470. As such, Plaintiff's matter is

---

[22] Moreover, to the extent Plaintiff alleges an equal protection violation under the NJCRA, this too fails as a matter of law. "The NJCRA cannot serve as the basis for a claim that alleges violations of equal protection rights on account of disability." *Ust v. Borough of Englewood Cliffs*, No. 17-13051, 2018 WL 4145905, at *5 (D.N.J. Aug. 30, 2018); *see also id.* at n.6 (explaining "NJCRA claim predicated on allegations of disability discrimination cannot go forward as such a claim would frustrate the remedial schemes of the ADA and the New Jersey Law Against Discrimination.")

[23] While arguments raised on reply need not be considered, the Court will address Plaintiff's argument briefly. *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 204 n.29 (3d Cir. 1990) ("As a general matter, the courts of appeals will not consider arguments raised on appeal for the first time in a reply brief.").

not one of public concern. *Id.*; *Garvey v. Barnegat Bd. of Educ.*, No. 07-6134, 2008 WL 2902617, at *6 (D.N.J. July 24, 2008) (finding plaintiff's employment grievances to the board regarding the plaintiff's "own employment situation [were] . . . not matters of public concern"). Second, as the Court has discussed throughout this Opinion, Defendants have proffered a legitimate, non-retaliatory justification for their actions – Plaintiff's poor performance, which led to Defendants discharging Plaintiff. As such, Defendants have demonstrated the outcome would have been the same regardless of Plaintiff's alleged exercise of free speech rights. *See Lapolla*, 157 A.3d at 469.

In addition, Plaintiff argues that Defendants violated the NJCRA by failing to hold a public hearing on his termination under the Open Public Meetings Act ("OPMA") and the New Jersey Appellate Division's decision in *Rice v. Union Cnty. Reg'l High Sch. Bd. of Ed.*, 382 A.2d 386 (N.J. Super. Ct. App. Div. 1977). (*See* Pl. Reply at 5.) As the New Jersey Supreme Court has explained, "*Rice* . . . developed a procedural requirement designed to promote the opportunity for adversely affected individuals to exercise the specific right that the Legislature conferred on them." *Kean Fed'n of Tchrs. v. Morell*, 233 N.J. 566, 585 (2018). The "OPMA does not contain a requirement about the robustness of the discussion that must take place on a topic." *Id.* at 588. The procedural requirements mandated by *Rice* are not violated where the employee "received a public setting for the discussion and vote," even if there "may not have been much of a discussion, but it was done in public view, as was the vote." *Id.* Here, Plaintiff received a *Rice* Notice on June 23, 2017, (Pl. SOF 2 ¶ 68), and the Board voted on Plaintiff's termination, (Def. SOF 1 ¶¶ 72–73.)[24]

---

[24] Moreover, to the extent Plaintiff contends that Defendants' alleged violations of the collective bargaining agreement give rise to the NJCRA claim by failing to give sixty days' notice, the Court finds that Defendants complied with the notice requirements by mailing Plaintiff a non-renewal letter on April 27, 2017. (*See* Def. SOF 1 ¶ 76.) The Board terminated Plaintiff effective July 1, 2017. (*Id.* ¶ 74.)

For these reasons, the Court grants summary judgment in favor of Defendants on Count Nine and denies Plaintiff's Motion.

G. **PUBLIC POLICY**

In Count Ten, Plaintiff asserts a claim for "wrongful termination in violation of public policy under state law, negligence and other common law torts." (Compl. ¶ 158.) In moving for summary judgment, Defendant argues that Plaintiff fails to identify any public policies that Defendants have violated. (DMSJ at 34–35.) In response, Plaintiff argues that his complaints to the MTBOE, threatened litigation, and complaints to the New Jersey Division on Civil Rights establish that Defendants violated public policy. (Pl. Opp. at 44–48.)

Under New Jersey law, an employee may be terminated at will without cause. *Powell v. Advancing Opportunities*, No. 22-525, 2022 WL 16961387, at *3 (D.N.J. Nov. 16, 2022) (citing *Pierce v. Ortho Pharm. Corp.*, 417 A.2d 505, 508–09 (N.J. 1980)). The state has a "strong presumption that all employment relationships are terminable at-will." *Saari*, 2017 WL 1197756, at *51 (citations and quotation marks omitted). To overcome this presumption and assert a claim for wrongful termination, a plaintiff must show that the employee's termination violated "a clear mandate of public policy." *Pierce*, 417 A.2d at 512. However, Plaintiff's claims are prohibited because they "do[] not seek to vindicate interests independent of those protected by the LAD." *Russelman v. ExxonMobil Corp.*, No. 12-752, 2012 WL 3038589, at *4 (D.N.J. July 25, 2012); *Catalane v. Gilian Instrument Corp.*, 638 A.2d 1341, 1349 (N.J. Super. Ct. App. Div. 1994). ("[S]upplementary common law causes of action may not go to the jury when a statutory remedy under the LAD exists."); *Bell v. KA Indus. Servs., LLC*, 567 F. Supp. 2d 701, 709–10 (D.N.J. 2008) (denying public policy claim premised on violation of FMLA). Plaintiff's claim for wrongful termination in violation of a public policy is predicated on his alleged medical leave and retaliation

for taking same. Therefore, the Court grants Defendants summary judgment on Count Ten and denies Plaintiff's Motion.[25]

---

[25] As the Court grants judgment to Defendants on all counts, Defendants' argument that Plaintiff is not entitled to punitive damages is moot.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED**, and Plaintiff's Motion for Summary Judgment is **DENIED**. An appropriate Order will accompany this Opinion.

_____
**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

Dated: November 29, 2023